1  P.M. Bessette (Bar No. 127588)
2  **DEMLER, ARMSTRONG & ROWLAND, LLP**
   601 California Street, Suite 704
   San Francisco, CA 94105
3  Telephone:   (415) 949-1900
   Facsimile:    (415) 354-8380
4  Email:        bes@darlaw.com

5  Attorneys for Defendant
   NATIONAL STEEL AND SHIPBUILDING COMPANY
6

7

8

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11

12  RANDOLPH MORTON and          CASE NO.   18-cv-5956
    EDNA S. MORTON,
13
                 Plaintiffs,
14                               Los Angeles Superior Court Case No.
        vs.                      BC702643
15
    3M COMPANY a/k/a             NATIONAL STEEL AND
16  MINNESOTA MINING &           SHIPBUILDING COMPANY'S
    MANUFACTURING COMPANY;       NOTICE OF REMOVAL OF ACTION
17  ABB LTD individually and as  TO FEDERAL COURT
    successor in interest to BALDOR
18  ELECTRIC COMPANY; ABB
    INC. individual and as successor-in-
19  interest to BALDOR ELECTRIC
    COMPANY; ASTRA FLOORING
20  COMPANY; BALDOR ELECTRIC
    COMPANY; BORGWARNER
21  MORSE TEC LLC individually and
    as successor-in-interest, parent alter
22  ego and equitable trustee of BORG-
    WARNER CORPORATION;
23  CARLSON & BEAULOYE
    MACHINE SHOP, INC.; CBS
24  CORPORATION f/k/a VIACOM,
    INC. (as successor-by-merger to
25  CBS CORPORATION) f/k/a
    VIACOM, INC. (as successor-by-
26  merger to CBS CORPORATION)
    f/k/a WESTINGHOUSE
27  ELECTRIC CORPORATION);
    COUNTY MOTOR PARTS CO.,
28  INC.; DR. ING. J.C.F. PORSCHE
    AG; E.F. BRADY COMPANY,

_____
NATIONAL STEEL AND SHIPBUILDING COMPANY'S NOTICE OF REMOVAL OF ACTION TO FEDERAL
COURT

INC.; EATON CORPORATION;
EDELBROCK, LLC; FORD
MOTOR COMPANY; FRASER'S
BOILER SERVICE, INC.; FRYER
KNOWLES, INC.; GENERAL
ELECTRIC COMPANY;
GENUINE PARTS COMPANY;
HENNESSY INDUSTRIES, INC.
individually and as successor-in-
interest to AMMCO TOOLS, INC.;
HILL BROTHERS CHEMICAL
COMPANY;HONEYWELL
INTERNATIONAL INC., flea
ALLIED SIGNAL, INC., as
successor-in-interest to the
BENDIX CORPORATION;
NATIONAL STEEL AND
SHIPBUILDING COMP ANY;
THE PEP BOYS MANNY MOE &
JACK OF CALIFORNIA;
PNEUMO ABEX, L.L.C.
individually and as successor-in-
interest to PNEUMO ABEX
CORPORATION AND ABEX
CORPORATION; PORSCHE
CARS NORTH AMERICA; INC.;
SB DECKING, INC. formerly
known as SELBY BATTERSBY &
COMPANY; SCHNEIDER
ELECTRIC USA, INC. individually
and as successor-in-interest to
SQUARE D COMPANY; TRIPLE
A MACHINE SHOP, INC.; UNION
CARBIDE CORPORATION; and
DOES ONE through TWO
HUNDRED, inclusive,

Defendants.

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS

OF RECORD:

PLEASE TAKE NOTICE that Defendant NATIONAL STEEL AND

SHIPBUILDING COMPANY (hereinafter "NASSCO"), hereby

gives notice of the removal of the above-entitled action from the Los Angeles

Superior Court to the United States District Court for the Central District of

California pursuant to U.S.C. §§ 1442(a)(1) and 1446.  In support of the removal,

NASSCO respectfully states the following:

**Preliminary Matters**

1.     On April 18, 2018, Plaintiffs filed their personal injury complaint commencing the action entitled *Randolph Morton and Edna S. Morton.*, Los Angeles Superior Court Case No. BC702643, against NASSCO and other defendants.  A true and correct copy of the Complaint is attached as **Exhibit A**.

2.     NASSCO' agent for service of process was personally served with the Summons and Complaint on June 13, 2018.  A true and correct copy of the Summons and Proof of Service is attached as **Exhibit B**.

3.     The Complaint alleges that Mr. Morton suffered "exposure(s) to asbestos from the removal and installation of asbestos products at NASSCO'S premises including exposures on commercial and U.S. Navy ships docked at that premises."  **Exhibit A**, §VI at Page 5.  Plaintiffs further allege that Mr. Morton developed lung cancer as a result of his exposure to asbestos. **Exhibit A**, §V at Page 5.

4.     The Complaint alleges liability based upon Negligence, Strict Liability, Fraud, Conspiracy to Defraud and Market Share.  **Exhibit A**, Pages 1-15.  Plaintiffs' generally allege that Mr. Morton's cancer was caused by defendants' negligence and Mr. Morton's exposure to asbestos from premises and defective products "designed, manufactured, distributed, sold, installed and leased" by defendants, **Exhibit A**, §IV at Page 11.

5.     With respect to NASSCO, Plaintiffs allege that Mr. Morton was exposed to asbestos during his employment as a machinist and welder for California Electric Works "from the removal and installation of asbestos products at NASSCO'S premises including exposures on commercial and U.S. Navy ships docked at that premises."  **Exhibit A**, §VI at Page 5.

6.     After a review of the Complaint, it appeared to NASSCO that it stated Plaintiffs' claims in a manner or in sufficient detail so as to indicate to NASSCO that the case was potentially removable, in that Plaintiffs asserted that NASSCO

3

was liable for Mr. Morton's occupational exposures to asbestos and/or asbestos-containing products which would have occurred while he worked as an machinist and welder aboard U. S. Navy ships built or repaired by NASSCO.   Any vessel construction or repairs performed by NASSCO for the U.S. Navy or other branches of the United States military, or other agencies of the federal government was performed pursuant to contracts and specifications provided to NASSCO by those agencies of the federal government.

7.     This case is removable based on federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).  Plaintiffs' claims against NASSCO are based on Mr. Morton's alleged exposure to asbestos and asbestos-containing products arising out of work done on Navy ships at NASSCO.  To the extent that NASSCO built, performed work, or repaired equipment on a U.S. Navy ship or disturbed, installed or supplied equipment or materials in connection with that purported work, everything was done in accordance with specifications provided by the U.S. Navy and under the direction and control of the military and its officers.  Accordingly, this case is removable on the grounds of federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).

8.     Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the first receipt by NASSCO from which it ascertained that this case is removable. (28 U.S.C. § 1446(b)).

## Nature of Case

9.     The case is based on allegations that Mr. Morton developed an asbestos-related disease caused by exposure to asbestos and asbestos-containing products present on U.S. Navy ships at NASSCO. **Exhibit A**, §§V and VI at Page 5.

10.     Plaintiffs assert causes of action against NASSCO based in part on the allegation that NASSCO caused "exposure(s) to asbestos from the removal and installation of asbestos products at NASSCO'S premises including exposures on

4

commercial and U.S. Navy ships docked at that premises." **Exhibit A**, §VI at Page 5.

### Jurisdiction, Venue and Intradistrict Assignment

11.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1442(a)(1) as set forth below under Grounds for Removal.

12.     Venue is proper in Central District of California as the state court action, which is subject to this removal petition, was filed in the Superior Court of California for the County of Los Angeles where it was alleged that all parties are subject to personal jurisdiction.

13.     Furthermore, § 1442 authorizes such a removal without the consent of any other defendant.  See *Ely Valley Mines, Inc. v. Hartford Acc. & Indem. Co.*, 644 F.2d 1310, 1314-1315 (9th Cir. 1981) ("federal officer…can remove without other defendants joining the petition, and the entire case is removed to the federal court.").

### Grounds For Removal

14.     As noted above, this case is based on Plaintiffs' allegations that Mr. Morton was exposed to asbestos and asbestos products while doing work as a machinist and welder at NASSCO on U.S. Navy ships built and/or repaired by NASSCO and was diagnosed with lung cancer as a result. (See **Exhibit A**, §§V and VI at page5.)   Plaintiffs' claims against NASSCO are based on NASSCO'S alleged failure to "use reasonable care to prevent harm to others" during the working situation where he was engaged in the very activities that NASSCO was asked to perform by officials of the federal government - namely, construction or repair work aboard U.S. Navy ships. The basis for removal here is that, to the extent that Mr. Morton claims exposure to asbestos attributable to NASSCO while working on U.S. Navy ships, NASSCO was acting under an officer or agency of the U.S. within the meaning of 28 U.S.C. § 1442(a)(l) with regard to the manufacture and repair of those ships for the federal government, including all

5

aspects of warnings associated with those ships.

15.     Should Plaintiffs file a motion to remand this case, NASSCO respectfully requests an opportunity to respond more fully in writing, but offers the following authorities at this time:

16.     Removal pursuant to 28 U.S.C. § 1442(a)(l) is appropriate where the moving party can (1) demonstrate that it acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. (*Mesa v. California*, 489 U.S. 121, 124-125, 129-131, 134-135 (1989).)  As was recently recognized by the United States District Court for the Eastern District of Pennsylvania (the "home court" for the Asbestos MDL), NASSCO may properly remove this case to federal court if it establishes "colorable" right to assert a "federal" defense to Plaintiffs' claims.  (See *Hagen v. Benjamin Foster Co*., 739 F.Supp.2d 770 (E.D.Pa. Sept. 24, 2010.)  Here, NASSCO can satisfy all three of the *Mesa* elements, as it has a federal defense to this action, i.e., the "government contractor" defense, which would provide immunity to NASSCO for liability arising from injury caused to Mr. Morton by any exposure to asbestos on board a Navy vessel being constructed or repaired by NASSCO. (See *Boyle v. United Technologies Corp*., 487 U.S. 500, 504 (1988).)

17.     Removal on the basis of "federal officer" jurisdiction is not a new concept, and federal courts across the country have approved its use by government contractors.  For example, in *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court.  Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. (*Isaacson, supra*, 304 F.Supp. at 445.)  After a lengthy procedural history, the *Issacson* court ultimately held that the removal had been proper under the "federal officer" removal statute, due to defendants' status as government contractors.

1    (*Isaacson, supra,* 304 F.Supp. at 445.)

2        18.    In reaching its conclusion, the Isaacson court discussed in detail the
3    three elements necessary for removal under this statute.  First, a defendant must
4    demonstrate that it is a "person" within the meaning of the statute.  (*Isaacson,*
5    *supra*, 304 F.Supp. at 446.)  Second, the  defendant must establish that the suit is
6    "for any act under color of federal office," i.e., there is a causal connection
7    between the charged conduct and asserted official authority.  (*Id.* [citations
8    omitted].)  Causation exists if the predicate acts of the state court suit were
9    undertaken while the person was acting as or under a federal officer, and the acts
10   were under color of the relevant federal office.  (*Id*.)  Third, defendants must raise
11   a colorable claim to a federal law defense. (*Id*.) As previously stated, a colorable
12   claim to a federal defense can be predicated upon the federal government
13   contractor defense (*Isaacson, supra*, 304 F.Supp. at 449.)

14       19.    The first element – is NASSCO a "person" under the "federal officer"
15   removal statute, cannot be in dispute; the definition of "person" under that statute
16   includes a corporation.  (See *Isaacson, supra*, 304 F.Supp. at 446; see also *Hagen,*
17   *supra*, 739 F.Supp.2d at 776.)

18       20.    The second and third elements require a causal nexus between the
19   defendant's actions under the federal officer and plaintiff's state court claims, and
20   that a "colorable" federal defense has been established that would apply to the
21   plaintiff's claims. (*Isaacson, supra*, 304 F.Supp. at 447; see also *Hagen, supra*,
22   739 F.Supp.2d at 776.)  To show that a defendant acted "under the direction of a
23   federal officer," a substantial degree of direct and detailed federal control over
24   defendant's work must be shown.  (*Isaacson, supra*, 304 F.Supp. at 447; see also
25   *Hagen, supra*, 739 F.Supp.2d at 776, 784-785.)

26       21.    This analysis also applies to "failure to warn" cases where "there is
27   evidence that the government was involved in the decision to give, or not to give,
28   a warning."  (*Kerstetter v. Pacific Scientific Co*., 210 F.3d 431, 438 (5th Cir.) cert.

denied 531 U.S. 919 (2000).) The government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government.  (*Kerstetter, supra*, 210 F.3d at 438.)

22.    As stressed in *Kerstetter*, "[t]he government need not prepare the specifications to be considered to have approved them."  (*Kerstetter, supra*, 210 F.3d at 435.) The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. (*Id.*) While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government."  (*Id* .)  In this regard, "[t]he specifications need not address the specific defect alleged; the government need only evaluate the design feature in question."  (*Id.*) Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question.  (*Kerstetter, supr*a, 210 F.3d at 438.)  Stated another way, "[i]nadequacy [of  a warning] is not an issue when it is the government's warning in the first place."  (*Id.*)

23.    Other courts have recognized that "[t]he selection of the appropriate

design for military equipment…is assuredly a discretionary function….It often involves not merely engineering analysis but judgment as to the balancing of many technical, military and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness...." (*Sundstrom v. McDonnell Douglas Corp*., 816 F.Supp. 587, 597 (ND.Cal. 1993).)

24.     As a result, numerous courts have upheld removal because defendants were sued as a result of constructing products pursuant to military specifications. (See, e.g., *Reaser v. Allis Chambers Corp., et al*., CVOS-1296-SVW(SSx) (CD.Cal. June 23, 2008) [evidence provided by defendants General Electric and Viad Corporation established that the Navy exercised strict control over defendants' ability to place warnings on their products and Defendants met the elements of the government contractor defense]; *O'Connell v. Foster Wheeler Energy Corp., et al*., 2008 WL 1722079 (D.Mass. April 7, 2008); *Wright v. Foster Wheeler, et al.*, C07-05403 MJJ (ND.Cal. February 21, 2008) [removal was proper as Foster Wheeler provided sufficient evidence supporting a finding that the Navy had direct and detailed control over its ability to place warnings on its equipment manufactured for the Navy and according to precise Navy specifications]; *Nelson v. Foster Wheeler, et al* ., CV07-8338 VBF(RCx) (CD.Cal. February 8, 2008) [removal upheld because evidence provided by Foster Wheeler demonstrated that the equipment it manufactured for the Navy were subject to strict control and design specifications]; see also *Crocker v. Borden*, 852 F.Supp. 1322 (E.D.La. 1994) [holding that removal was proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications]; *Pack v. AC and S, Inc.,* 838 F.Supp. 1099 (D.Md. 1993) [holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth].)

25.     Plaintiffs may argue that, even if NASSCO can meet the requirements

9

of the "government contractor" defense, it could not successfully assert the government contractor defense because no conflict existed between the Navy's specifications and instructions and the state law claim. Federal courts have rejected this argument, and have ruled that a conflict between federal policy and state law exists if there is evidence that the Government was involved in the decision to give, or not to give, a warning. (*In re Air Disaster at Ramstein Air Base, Germany*, on 8/29/90, 81 F.3d 570, 576 (5th Cir. 1996), opinion amended on denial of reh'g sub nom. *Perez v. Lockheed Corp.*, 88 F.3d 340 (5th Cir. 1996).)

26. As the Court noted in *Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998), at 660-661:

> Contrary to plaintiffs' argument, the government contractor defense is not narrowly confined to those situations where a particular military specification directly conflicts with state law. *Instead, the defense applies whenever state tort liability would otherwise restrict the government's ability to exercise its discretion in military matters. This includes those situations in which the government makes the informed decision not to include a specification or require a warning because, in the government's view, one would be unnecessary or problematic.*

> As this court stated in Tate I, "[W]hen the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability." 55 F.3d at 1157. Therefore, once the three conditions of the *Tate I* analysis has been satisfied and government discretion has thus been established, significant conflict exists and the government contractor defense applies.

27. The Federal District Court in the Northern District of California has addressed almost an identical situation before, and determined that the defendant's removal had been appropriate. In *Ballenger v. Agco Corp.*, 2007 WL 1813821 (ND.Cal. June 22, 2007),Todd Shipyards removed a case to federal court after being sued by the heirs of John Ballenger, who suffered occupational exposure to asbestos-containing products "while working on premises owned or operated by Todd Shipyards." (*Ballenger, supra*, 2007 WL 1813821 at *l.) In denying remand in that case, based on a determination that removal under Section 1442(a)(l) had

10

been proper, this Court found a declaration from Admiral Roger B. Horne (submitted on behalf of Todd Shipyards) sufficient to establish both that Todd Shipyards had acted under the "direct and detailed control" of the Navy with regard to its shipyard construction and repair work on Navy vessels, and that the requisite "causal nexus" existed between Todd Shipyards' repair work and Plaintiffs' claims against it in that case. (See *Ballenger, supra*, 2007 WL 1813821 at *3-*4.)

28.    In the present case, officers of the U. S. Navy, and other federal officers, were significantly involved in the acts providing the foundation for Plaintiffs' state court claims against NASSCO -indeed, without the federal government having asked NASSCO to manufacture equipment and build and/or repair its ships, Plaintiffs would not have a claim against it. Here, the requisite "causal nexus" between NASSCO 's activities pursuant to federal officer direction, and the necessary "colorable federal defense" to Plaintiffs' claims against it, exists here. This case is thus substantially similar to *Ballenger*, *Kerstetter*, and numerous other cases that have addressed this issue.

29.    In support of its removal, NASSCO has submitted declarations that do not contain speculative or conclusory opinions, but are accurate attestations concerning the strict scrutiny by Naval and other federal officers of all construction or repair work done by NASSCO for the federal government, including making decisions with regard to allowing warnings to be affixed on products aboard its ships.

30.    As explained by Admiral Roger B. Horne, Jr. any and all work performed by Mr. Morton during the construction and/or repair of U.S. Navy and U.S. military vessels would have been performed to the requirements specified by Naval or other federal officers, including federal health and safety standards, and would have been reviewed and inspected by Navy or other federal personnel. (See, Horne Declaration, at ¶ 4. Adm. Horne later elaborated:

1
2
3
4
5
6
7

> During all aspects of Mr. Morton's work aboard Navy vessels, the U.S. Navy and government personnel would have exercised ultimate control of the vessels and of the work performed aboard them.  In the event of any unsafe work practices being performed by contractors aboard the vessels, Navy and government personnel had the authority and control to direct that the practices either be modified or stopped.  Similarly, during repair operations aboard the Navy vessels,, ownership and custody of the ships, as well as the materials used for repairs and control of the work practices of contractors, vested in the U.S. Navy and government personnel. In fact, the Commanding Officer of military ships never relinquished his duty and responsibility for safety of the ship and crew and adherence to federal health and safety standards during the shipyard repairs.

8   (Horne Declaration, at ¶ 5 c).)

9       31.    As noted in Adm. Horne's declaration, military specifications

10   ("MilSpecs") for the manufacture of equipment and construction and repair of

11   military vessels built for the Navy until the late-1960s and early-1970s mandated

12   the use of asbestos or asbestos-containing equipment in the design, manufacture

13   and repair  of  vessels,  and shipyards,  equipment manufacturers, Naval

14   Machinery Inspectors and others relied on the MilSpecs to ensure strict

15   compliance with the Navy's demands and requirements for combat-ready vessels.

16   (Horne Declaration, at ¶ 7.)  As stated in Adm. Horne's declaration, the Navy not

17   only prepared equipment, ship construction and repair specifications, but also

18   stationed Naval Machinery Inspectors at shipyards like NASSCO to assure that

19   Naval contractors followed the required specifications.  (Horne Declaration, at ¶ 5

20   d).)

21       32.    Further, all private contractors, such as NASSCO, performed their

22   work pursuant to precise requirements imposed by the U.S. Navy and under the

23   Navy's detailed supervision and control:

24
25
26
27
28

> All private contractors, such as NASSCO, performed their work pursuant to precise requirements imposed by the U.S. Navy and under the Navy's detailed supervision and control.  For work aboard Navy vessels, the Navy dictated every aspect of the design, manufacture, installation, overhaul, repair, written documentation, safety conditions and warnings associated with its ships...and did not permit deviations from its contractors. Any changes to the specifications for work aboard naval vessels had to be approved by the Supervisor of Shipbuilding (SUSHIP) and the Chief of the Bureau of Ships (BUSHIPS ) (which later became NAVSEA) ....

The U.S. Navy adheres to strict protocols for work by civilian contractors aboard naval ships and those protocols include the setting and enforcement of federal health and safety standards. For the drafting of those protocols, the Navy has been granted the power to exercise unrestricted discretion in military matters in order to insure the government's role as the defender of the country. In 1971, in an exercise of his authority and discretion, the Commander, Naval Ship Systems Command adopted regulations and controls relating to the removal and handling of asbestos-containing products. The regulations contained various measures, including the posting of suggested signage aboard vessels. To the extent the signage recommended by the Navy did not rise to the level of warning as may have been mandated by State law, the Navy language would have prevailed, absent a directive from the U.S. Navy.

In summary,… I can attest that shipyards, such as NASSCO, were required to fully comply with all contracts, plans and specifications the Navy set forth in the construction, maintenance and repairs of its vessels. It has been the standard policy of the Navy that no military vessels would be accepted by the Navy from a private repair yard without strict compliance from the contractor of all requirements, including specified health and safety standards. Navy specifications controlled all aspects of work performed aboard naval ships and naval personnel had final approval of technical and engineering materials, operating manuals, and hazard information. In my opinion, the Navy determined the nature of hazards aboard ships and had control over precautionary labeling and signage about the use of said products aboard its ships. Further, in my experience, it is my opinion that no private contractor could have affixed a written warning anywhere aboard an active duty Navy warship, advising of the risk of asbestos exposure, except by permission and direction of the U.S. Navy.

(Horne Declaration, at ¶¶ 14, 15, and 18.)

33. In addition, among the requirements imposed on private contractors by the Navy was the use of asbestos-containing materials in the construction, maintenance and repair of naval vessels. This requirement reflected the state of the art at the time, as well as the demands and requirements of combat ready Navy vessels. As noted by Admiral Horne:

Navy combat ships are complex and are intended to operate in war time environments. The Navy relied on the use of literally tons of asbestos on its destroyers and other warships. The Navy determined that asbestos was lighter in weight than other known insulating materials, thereby allowing ships to carry greater amounts of armaments and travel with greater speed and less fuel, was water resistant, less corrosive and provided the better protection against fire, smoke inhalation, and the tremendous temperatures generated on board naval vessels than other known materials. During World War II, the Korean conflict and thereafter, the use of asbestos directly increased the survivability of our naval forces and the chances for ultimate success against our nation's enemies.

Most naval warships contained between 22 tons of asbestos insulation for a

13

destroyer and over 200 tons of asbestos insulation for an aircraft carrier. Fire was one of the biggest concerns on combat ships and could lead to great loss of sailors' lives. During World War II, the Navy had a tremendous problem in that United States ships were being sunk about as fast as the Navy could build them. Because of its superior qualities as an insulate, relative light weight, fire and water resistant qualities, and because it doesn't produce smoke, asbestos was used throughout all combat vessels, including in the propulsion plants, fire and engine rooms, wherever the many miles of piping were located, and in the hull, bathrooms and sleeping quarters. Without its insulate qualities, tremendous temperatures would have made working with the boilers, pumps, turbines and generators and generally in the fire and engine rooms impossible. The Navy had determined that there was no viable substitute for asbestos until beginning around the late 1960's - early 1970's. The presence of asbestos on combat ships during World War II likely saved thousands of lives of U.S. personnel.

By way of example, in World War II the first major sea battle after Pearl Harbor was the Battle of the Coral Sea. The American aircraft carrier, Yorktown, was so badly damaged that the Japanese thought it had been sunk. The Yorktown limped back to Pearl Harbor for repairs. It was thought those repairs would take several months.  Instead, the Yorktown was ordered to leave Pearl Harbor within 48 hours so that it could participate in the Battle of Midway.

The Battle of Midway was a tremendous victory for the American forces and is considered by historians to be the turning point in the Pacific War in World War II. The presence of the American aircraft carrier, Yorktown, was instrumental in achieving that American victory. Based upon my experience as set forth in this Affidavit, I believe that the protection against fire provided by the asbestos on the Yorktown was a key factor in its surviving the Battle of the Coral Sea and subsequently participating in the Battle of Midway.

This is but one example why the U.S. Navy determined that asbestos was an indispensable material to be used in the construction of Navy ships, in spite of its knowledge  of  the potential hazards accompanying  its use.

(Horne Declaration, at ¶ 11.)

34.     Further, Admiral Horne attests, the Navy had superior knowledge of

the dangers of asbestos prior to and during the time that NASSCO provided work

aboard "military equipment," and would not have allowed any warnings to be

affixed to its equipment:

Based on my review of reports created by the Maritime Commission and the Navy  from the 1930's and 1940's, which included  medical  surveys and studies of Navy personnel, the Navy was aware, at least by the 1930's, of the potential for serious health hazards from exposure to asbestos.  In my opinion, the Navy's knowledge of the medical effects of long-term exposure to asbestos was state-of-the-art.  The Navy had  access to medical studies and surveys of the long-term effects of exposure to asbestos and participated in the health inspections in the 30's identifying asbestos as a problem under certain circumstances.  Notwithstanding knowledge of the serious potential

14

health hazards of exposure to asbestos, the Navy consistently maintained the policy of neither permitting written warning labels to be affixed to asbestos insulation or on  asbestos-containing equipment installed on its naval vessels nor permitting manufacturers and suppliers of  asbestos insulation or asbestos-containing  equipment  to transmit written or other warnings to naval personnel. This remained to be the Navy's policy even after the Navy's knowledge advanced during the 1960's to include the recognition that exposure to asbestos could cause cancer. After this time, the Navy established control practices during the removal and handling of new asbestos insulation, but the Navy   continued its practice of not placing warnings regarding the health hazards of asbestos on pumps and valves or the miles of insulated pipe on board its warships through  the  1980's and beyond.

With respect to constructors of naval vessels, even after a link between asbestos exposure and cancer became known, the Navy would have refused any request for a vessel builder or repairer, such as NASSCO, to affix warnings about asbestos, include them in any manuals, or transmit them to naval personnel. If any vessel constructor, equipment manufacturer or supplier would have written or otherwise reported to the Navy that the product it or some other manufacturer or supplier provided the Navy could or would cause health problems or hazards, it would have been Navy practice and procedure to direct such warning or advice to the Navy's Bureau of Medicine. It was the Bureau of Medicine's teams of physicians who had the expertise over materials which could or would affect the health of Navy personnel. The surveys and studies conducted on Navy personnel in the 1930's and 1940's regarding the effects of exposure to asbestos dust which I've reviewed were conducted by the Navy's Bureau of Medicine.

(Horne Declaration, at ¶¶ 12 and 13.)

35.    In further support of the removal, NASSCO provides the Affidavit  of Admiral Ben J. Lehman, U.S. Navy, Ret.  (See Affidavit of Admiral Lehman, dated October 6, 2004, attached hereto as **Exhibit D**.)  Admiral Lehman joined the Navy in 1942, and worked as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the Alameda Naval Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in Alameda from 1952 to 1054. (**Exhibit D**, at ¶ 1.) During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was personally involved with the supervision and oversight of ship alterations and equipment overhauls at the Brooklyn Navy Yard. (**Exhibit D**, at ¶ 3.)

36.    Admiral Lehman states in his Affidavit that the Navy controlled every aspect of the design and manufacture of equipment intended for installation on

Navy vessels and that the Navy could not – and did not – permit its contractors to implement changes from military specifications. (**Exhibit D**, at ¶¶ 2, 3.) He further states:

> In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy  This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.
>
> Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment.  The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

(**Exhibit D**, at ¶ 5.)

37.     Finally, the Navy would not have allowed its vessel constructors and repairers, such as NASSCO, to affix any warnings related to any asbestos hazards on their equipment, including its boilers or in their technical and operations manuals. As noted by Adm. Horne:

> A shipyard such as NASSCO would have no control and would not have been permitted (either under the military specifications or, as a matter of Navy practice) to include a warning or cautionary statement not required by the Navy, including any statements related to asbestos.  Any attempt by NASSCO to include a cautionary statement concerning asbestos in a technical or instruction manual would have been futile as it would have been rejected by the Navy as contrary to MilSpecs. A shipyard such as NASSCO would not have been permitted (either under the specifications, or, as a matter of Navy practice) to attach any type of warning or cautionary statement, or include information in any manual, not required by the Navy, including any statements related to asbestos. As there were hundreds of pieces of equipment on board, the Navy would not permit warnings to be affixed on hundreds of pieces of equipment and miles of insulated pipe.

(Horne Declaration, at ¶16.)

38.     Through the declarations of Adm. Horne and Adm. Lehman,

16

NASSCO has established that the Navy exercised significant discretion regarding asbestos warnings and the instructions and supervision given to its equipment manufacturers and shipyard contractors. Further, the Navy had superior knowledge of the hazards of asbestos, far beyond any information that NASSCO could ever have provided. And, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships, and did not permit deviations from any of its contractors, including NASSCO.

39.     For all the reasons set forth above, the "government contractor" defense has been colorably established by NASSCO in this case, and federal removal jurisdiction under 28 U.S.C. § 1442(a)(l) has been properly and timely invoked.  (See *Ballenger, supra*, 2007 WL 1813821; *Wright v. A.W. Chesterton, et al* ., C07-05403 MJJ (N.D.Cal. February 21, 2008); *Nelson v. Alfa Laval, et al*., CV07-8338 VBF(RCx) (CD.Cal. February 8, 2008); see also *Fink v. Todd Shipyards*, No. 04-430, 2004 U.S. Dist. LEXIS 6912 (ED.La. April 20, 2004); *Delancey v. General Electric*, No. 04-431(E.D.La. filed Mar. 31, 2004); *Chicano v. General Electric Co*., No. 03-5126 (ED.Pa. filed Apr. 6, 2004); *Mitchell v. AC&S* , No. 04-2713 (E.D.VA filed Dec. 15, 2004); *Feidt v. Owens Corning Fiberglas Corp*., 153 F.3d 124, 127 (3rd Cir. 1998); *Crocker v. Borden, Inc*., 852 F. Supp. 1322, 1327 (ED. La. 1994); *Pack v. AC and S, Inc*., 838 F. Supp. 1099, 1103 (D. Md.  1993).)

40.     A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. (28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976).) The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(l).   (*Willingham v. Morgan*, 395 U.S. 402, 405 (1960).)

41.   As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon NASSCO are being filed with this Joinder in Notice of Removal.

### Conclusion

42.   Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(l) because NASSCO was acting under an officer or agency of the United States.

THEREFORE,  Defendant NASSCO pursuant  to these statutes and in conformance with the requirements  set forth in  28 U.S.C. § 1446, removes this action for trial from the Superior Court of the State of California, County of Los Angeles, on this 9th day of July 2018.

DEMLER, ARMSTRONG & ROWLAND, LLP


/s/ P.M. Bessette
P.M. Bessette
Attorneys for NATIONAL STEEL AND
SHIPBUILDING COMPANY

NATIONAL STEEL AND SHIPBUILDING COMPANY'S NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

# EXHIBIT A

1  Trey Jones (SBN 237607)
2  **LAW OFFICE OF H.W. TREY JONES**
   680 South Santa Fe Ave
3  Los Angeles, CA 90021-1315
   (310) 575-9955
4  Trey@treyjoneslaw.com
5
6  Attorney for Plaintiffs
   Randolph J. Morton and
7  Edna S. Morton
8
9            SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                      COUNTY OF LOS ANGELES

11                                              BC 7 0 2 6 4 3

12  RANDOLPH MORTON and EDNA S.    )   LASC Case No.
    MORTON                        )
13                                )   **COMPLAINT FOR PERSONAL**
14        Plaintiff,              )   **INJURY( SURVIVORSHIP)**
                                  )
15  vs.                           )   **DEMAND FOR JURY TRIAL**
                                  )
16  3M COMPANY a/k/a MINNESOTA MINING )   1.  **STRICT LIABILITY**
    & MANUFACTURING COMPANY; ABB  )   2.  **NEGLIGENCE**
17  LTD individually and as successor in interest to )   3.  **FRAUD**
18  BALDOR ELECTRIC COMPANY; ABB INC. )   4.  **CONSPIRACY TO DEFRAUD**
    individual and as successor-in-interest to )   5.  **MARKET SHARE**
19  BALDOR ELECTRIC COMPANY; ASTRA )
20  FLOORING COMPANY; BALDOR      )
    ELECTRIC COMPANY; BORGWARNER  )
21  MORSE TEC LLC individually and as )
22  successor-in-interest, parent, alter ego and )
    equitable trustee of BORG-WARNER )
23  CORPORATION; CARLSON & BEAULOYE )
    MACHINE SHOP, INC.; CBS       )
24  CORPORATION f/k/a VIACOM, INC. (as )
25  successor-by-merger to CBS CORPORATION) )
    f/k/a WESTINGHOUSE ELECTRIC   )
26  CORPORATION); COUNTY MOTOR PARTS )
    CO. INC.; DR. ING. H.C. F. PORSCHE AG; E. )
27  F. BRADY COMPANY, INC.; EATON )
28  CORPORATION; EDELBROCK, LLC; FORD )
    MOTOR COMPANY; FRASER'S BOILER )

                                  1

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

APR 18 2018

Sherri R. Carter, Executive Officer/Clerk
By Nancy Alvarez, Deputy

1  SERVICE, INC.; FRYER KNOWLES, INC.; )
   GENERAL ELECTRIC COMPANY;          )
2  GENUINE PARTS COMPANY; HENNESSY    )
3  INDUSTRIES, INC. individually and as  )
   successor-in-interest to AMMCO TOOLS, )
4  INC.; HILL BROTHERS CHEMICAL        )
   COMPANY; HONEYWELL                  )
5  INTERNATIONAL INC., fka ALLIED      )
6  SIGNAL, INC., as successor-in-interest to the )
   BENDIX CORPORATION; NATIONAL        )
7  STEEL AND SHIPBUILDING COMPANY;     )
   THE PEP BOYS MANNY MOE & JACK OF    )
8  CALIFORNIA; PNEUMO ABEX, L.L.C      )
9  individually and as successor-in-interest to )
   PNEUMO ABEX CORPORATION AND         )
10 ABEX CORPORATION; PORSCHE CARS      )
   NORTH AMERICA, INC.; SB DECKING,    )
11 INC. formerly known as SELBY,       )
12 BATTERSBY & COMPANY; SCHNEIDER      )
   ELECTRIC USA, INC. individually and as )
13 successor-in-interest to SQUARE D    )
   COMPANY; TRIPLE A MACHINE SHOP,     )
14 INC.; UNION CARBIDE CORPORATION;    )
15 and DOES ONE through TWO HUNDRED,   )
   inclusive,                          )
16          Defendants.                )
17                                      )

18

19                    **GENERAL BACKGROUND**

20                          I.

21      **The Plaintiff:** Randolph Morton was diagnosed with lung cancer in October of 2017. Randolph

22 Morton's cancer was caused by asbestos exposures for which the defendants bear responsibility.

23                          II.

24      **The Defendants:** All the defendants are listed in the case caption. The true names of defendants

25 sued as Does are unknown to plaintiff. Each of the defendants was the agent, employee and/or joint

26 venturer of his co-defendants and was acting in the full course and scope of the agency, employment

27 and/or joint venture. For some liability theories, some defendants are classified as follows:

28

                                  2

| NO. | TYPE | DEFENDANTS |
|---|---|---|
| 1. | Product Defendants | 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY; ABB LTD individually and as successor in interest to BALDOR ELECTRIC COMPANY; ABB INC. individual and as successor-in-interest to BALDOR ELECTRIC COMPANY; ASTRA FLOORING COMPANY; BALDOR ELECTRIC COMPANY; BORGWARNER MORSE TEC LLC individually and as successor-in-interest, parent, alter ego and equitable trustee of BORG-WARNER CORPORATION; CARLSON & BEAULOYE MACHINE SHOP, INC.; CBS CORPORATION f/k/a VIACOM, INC. (as successor-by-merger to CBS CORPORATION) f/k/a WESTINGHOUSE ELECTRIC CORPORATION; COUNTY MOTOR PARTS CO. INC.; DR. ING. H.C. F. PORSCHE AG; E. F. BRADY COMPANY, INC.; EATON CORPORATION; EDELBROCK, LLC; FORD MOTOR COMPANY; FRASER'S BOILER SERVICE, INC.; FRYER KNOWLES, INC.; GENERAL ELECTRIC COMPANY; GENUINE PARTS COMPANY; HENNESSY INDUSTRIES, INC. individually and as successor-in-interest to AMMCO TOOLS, INC.; HILL BROTHERS CHEMICAL COMPANY; HONEYWELL INTERNATIONAL INC., fka ALLIED SIGNAL, INC., as successor-in-interest to the BENDIX CORPORATION; THE PEP BOYS MANNY MOE & JACK OF CALIFORNIA; PNEUMO ABEX, L.L.C individually and as successor-in-interest to PNEUMO ABEX CORPORATION AND ABEX CORPORATION; PORSCHE CARS NORTH AMERICA, INC.; SB DECKING, INC. formerly known as SELBY, BATTERSBY & COMPANY; SCHNEIDER ELECTRIC USA, INC. individually and as successor-in-interest to SQUARE D COMPANY; TRIPLE A MACHINE SHOP, INC.; UNION CARBIDE CORPORATION; |
| 2. | Friction Defendants | BORGWARNER MORSE TEC LLC individually and as successor-in-interest, parent, alter ego and equitable trustee of BORG-WARNER CORPORATION; CARLSON & BEAULOYE MACHINE SHOP, INC.; COUNTY MOTOR PARTS CO. INC.; DR. ING. H.C. F. PORSCHE AG; FORD MOTOR COMPANY; GENUINE PARTS COMPANY; HONEYWELL INTERNATIONAL INC., fka ALLIED SIGNAL, INC., as successor-in-interest to the BENDIX CORPORATION; THE PEP BOYS MANNY MOE & JACK OF CALIFORNIA; PNEUMO ABEX, L.L.C individually and as successor-in-interest to PNEUMO ABEX CORPORATION AND ABEX CORPORATION; PORSCHE CARS NORTH AMERICA, INC.; |

3

| 3. | Respirator Defendants | 3M COMPANY a/k/a MINNESOTA MINING & MANUFACTURING COMPANY |
|----|----|----|
| 4. | Premises defendants | NATIONAL STEEL AND SHIPBUILDING COMPANY |

### III.

**Venue:** Venue is proper in Los Angeles County because some defendants reside in Los Angeles County.

### IV.

**The Asbestos Exposures:** Randolph Morton was exposed to asbestos as follows:

| NO. | TYPE | DESCRIPTION |
|----|----|----|
| 1. | Exposure while working on automobiles and race cards. | From 1961 through the 2000s Randolph Morton did repairs to his personal automobiles and to those of his friends and family members. From 1961 to 1965, Mr. Morton also took auto shop classes in high school where he worked on his own automobiles and those of friends, classmates and teachers. From 1965 to 1970, Mr. Morton worked as a professional race car mechanic, machinist and fabricator. Mr. Morton's work on automobiles and race cars involved changing brakes, clutches and gaskets. This work, and similar work done by others in his vicinity, caused him to be exposed to asbestos. Mr. Morton used arc grinding machines to grind brakes to fit. He also machined disc brakes and clutches. |
| 2. | Exposure from machinery repair. | From approximately 1970 to 1972, Randolph Morton worked as a machinist and welder at California Electric Works. He primarily overhauled electric motors, many of which were aboard ships. He also repaired electrical equipment including motor controllers. |

4

| | | This work and similar work done in his vicinity caused asbestos exposures. He occasionally boarded ships to repair motors and was exposed to asbestos from this work and the work of other tradesman working on the ships. |
| 3. | Exposure to construction | In the mid 1970's, Randolph Morton was a bystander to residential and commercial construction work. |

V.

**The Harm:** Randolph Morton was diagnosed with lung cancer on or about October 2017. The cancer caused Randolph Morton to experience financial harm as well physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other similar harm. Plaintiff are not claiming any damages barred by California Code of Civil Procedure section 377.34.

VI.

**Waiver:** Plaintiffs hereby waive any claims against ABB LTD individually and as successor in interest to BALDOR ELECTRIC COMPANY; ABB INC. individual and as successor-in-interest to BALDOR ELECTRIC COMPANY; BALDOR ELECTRIC COMPANY; CBS CORPORATION f/k/a VIACOM, INC. (as successor-by-merger to CBS CORPORATION) f/k/a WESTINGHOUSE ELECTRIC CORPORATION and GENERAL ELECTRIC COMPANY relating to or arising out of Randolph Morton's asbestos exposure(s) from products sold or supplied to the U.S. military or government. Randolph Morton never served in the U.S. military and was never employed by the U.S. government. Plaintiffs waive any claims against any defendant for exposure to asbestos at a federal enclave. Plaintiffs claims against NATIONAL STEEL AND SHIPBUILDING COMPANY are not related to its design and manufacture of military equipment. Plaintiffs' claims against NATIONAL STEEL AND SHIPBUILDING COMPANY are limited to general negligence and premises liability for causing Randolph Morton's exposure(s) to asbestos from the removal and installation of asbestos products at NATIONAL STEEL AND SHIPBUILDING COMPANY's premises including exposures on commercial and U.S. Navy ships docked at that premises.

5

## FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY

### I.

Design Defect: All named defendants except NATIONAL STEEL AND SHIPBUILDING COMPANY, and the 1st through 50th Doe defendants, are strictly liable for their products' design defects under the consumer-expectations test.   First, these defendants designed, manufactured, distributed, sold, and leased the products. Second, each product did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because each product caused hazardous asbestos to become airborne.  For all respirator defendants, each product did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the respirators failed to prevent Randolph Morton from breathing asbestos fibers.  Third, Randolph Morton developed cancer. Fourth, each product's failure to perform safely was a substantial factor in causing Randolph Morton's cancer.  All named defendants, and the 1st through 50th Doe defendants are strictly liable for their products' design defects under the risk-benefit test. First, these defendants designed, manufactured, distributed, sold, and leased the products.  Second, Randolph Morton developed cancer.  Third, each product's design was a substantial factor in causing Randolph Morton's cancer.

### II.

Design Defect: Brake and Clutch Assemblies: All friction defendants, and the 1st through 50th Doe defendants, are liable for the defective design of their brake and clutch assemblies. In addition to the Design Defect allegations set forth in Paragraph I above, plaintiffs allege that the brake and clutch assemblies required linings.  During all relevant time periods, all brake and clutch linings in brake and clutch assemblies used with or on automobiles, light and commercial trucks, and ground support equipment contained asbestos. The brakes and clutch assemblies were specifically designed so that the lining was subject to friction from other assembly parts such as a brake drum or clutch pressure plate to achieve the intended control of power or motion. The friction resulted in abrasion of the lining and the release of asbestos dust, which was encapsulated in the brake or clutch assembly.  As such, the clutch and brake assemblies were intended to be used in a way that inevitably exposed users to asbestos dust. The fact that there might have existed some non-asbestos linings for other purposes such as race or

6

1  police cars did not make the use of asbestos linings in the brake and clutch assemblies any less
2  inevitable.

3                                          **III.**

4      **Failure-to-Warn Defect:**  All  named  defendants  except  NATIONAL  STEEL  AND
5  SHIPBUILDING COMPANY, and the 1st through 50th Doe defendants, are strictly liable for their
6  products' failure-to-warn defects, including defect in brake and clutch assemblies as set forth in
7  Paragraph II, above.  First, these defendants designed, manufactured, distributed, sold, and leased the
8  products.  Second, each product had potential risks that were known or knowable in light of the
9  scientific and medical knowledge that was generally accepted in the scientific community at the time of
10 design, manufacture, distribution, sale, and lease.  Third, the potential risks presented a substantial
11 danger when each product was used or misused in an intended or reasonably foreseeable way, because
12 each product caused hazardous asbestos to become airborne, or, for the respirator defendant, each
13 product failed to prevent the inhalation of asbestos fibers. Fourth, ordinary consumers would not have
14 recognized the potential risks. Fifth, these defendants failed to adequately warn or instruct of the
15 potential risks. Sixth, Randolph Morton developed cancer.  Seventh, the lack of sufficient warnings or
16 instructions was a substantial factor in causing Randolph Morton's cancer.

17                                         **IV.**

18     **Knowledge of Hazards:**  The following facts are illustrative, but not exhaustive, of the
19 evolution of the knowledge of the health hazards of asbestos.  Health hazards from asbestos exposure
20 were identified in the 1890s. During this time, the Lady Inspectors of Factories in Great Britain noted
21 that individuals working with asbestos were suffering various lung injuries.  As early as the 1920s, the
22 term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in
23 Great Britain and the United States detailed asbestosis in various workers. By 1929, lawsuits for
24 disability related to exposure to asbestos were filed against Johns Manville.

25      In the late 1930s, case reports addressing the relationship between asbestos and cancer were
26 published.  In 1931, the United Kingdom allowed workers to receive compensation for asbestosis. In
27 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for
28 work with asbestos.  The same year, the State of Illinois enacted legislation recognizing asbestosis as a

                                          7

compensable occupational disease under its Occupational Disease Act.

By the 1940s, asbestos carcinogenicity was noted in reviews in fields of industrial medicine and cancer research. In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure. In 1955, Richard Doll published a study linking asbestos to lung cancer. In 1960, Chris Wagner published a study linking asbestos to mesothelioma. In the early 1960s, Dr. Irvin Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the *Annals of the New York Academy of Sciences* published in 1965.

In addition, beginning in the 1940s and 1950s, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

During the 1940s and 1950s, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949), Newsweek (May 15, 1950), and Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the *New Yorker*.

In 1969, product liability lawsuits were brought against asbestos manufacturers. Under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere a workplace standard of 12 fibers per cubic centimeter of air. In 1970, OSHA established the first federal guidelines for workplace asbestos exposure, which took effect in 1971. In 1972, the American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen.

Several publications provided notice to defendants regarding the hazards of asbestos containing automotive friction products and the availability of substitutes for asbestos in those products. These include, but are not limited to, the following: The February 1948 edition of the *National Safety News*, published by the National Safety Council, identified asbestos in brake linings as a potentially harmful

1  compound. In 1950, in a paper presented by S.K. Wellman Co. at the Sixth Annual Meeting and Exhibit
2  of the Metal Powder Association in Detroit, Michigan, metal powder was identified as an alternative to
3  asbestos for use in friction products. In 1970, an article in *Cancer* identified individuals with
4  mesothelioma who had worked as brake mechanics. In 1975, NIOSH issued the Current Intelligence
5  Bulletin which linked asbestos exposure from brake repair work to disease. In 1982, the journal *Lancet*
6  reported a case of mesothelioma in a brake repair worker whose sole exposure to asbestos arose from
7  chrysotile asbestos released during brake maintenance and repair. In 1986, the EPA published the Gold
8  Book, which warned defendants about asbestos diseases among auto mechanics.
9                                            **V.**
10         **Manufacturing Defect:** All named defendants except NATIONAL STEEL AND
11  SHIPBUILDING COMPANY, and the 1st through 50th Doe defendants, are strictly liable for their
12  products' manufacturing defects. First, these defendants designed, manufactured, distributed, sold, and
13  leased the products. Second, each product contained a manufacturing defect when it left these
14  defendants' possession. Specifically, each product differed from the design or specifications or from
15  other typical units of the same product line, because each product caused hazardous asbestos to become
16  airborne. Third, Randolph Morton developed cancer. Fourth, each product's defect was a substantial
17  factor in causing Randolph Morton's cancer.
18                    **SECOND CAUSE OF ACTION FOR NEGLIGENCE**
19                                            **I.**
20         **General Negligence:** All named defendants, and the 1st through 100th Doe defendants, are
21  liable for their general negligence. First, the defendants failed to use reasonable care to prevent harm to
22  others, because they caused hazardous asbestos to become airborne. For the respirator defendants, each
23  product failed to prevent the inhalation of asbestos fibers. Second, the defendants did so by
24  unreasonably acting and failing to act. They acted in ways that a reasonably careful person would not do
25  in the same situation, and failed to act in ways that a reasonably careful person would do in the same
26  situation. Third Randolph Morton developed cancer. Fourth, each defendant's general negligence was a
27  substantial factor in causing Randolph Morton's cancer.
28                                            **II.**

1    **Negligent Design, Manufacture, Supply, Installation, Inspection, Repair, and Leasing of**
2    **Products:** All named defendants except NATIONAL STEEL AND SHIPBUILDING COMPANY, and
3    the 1st through 100th Doe defendants, are liable for their negligent design, manufacture, supply,
4    installation, inspection, repair, and leasing of their products. NATIONAL STEEL AND
5    SHIPBUILDING COMPANY is only named for negligent installation and repair of asbestos products.
6    First, these defendants designed, manufactured, supplied, installed, inspected, repaired, and leased the
7    products. Second, these defendants were negligent in designing, manufacturing, supplying, installing,
8    inspecting, repairing, and leasing the products, because they caused hazardous asbestos to become
9    airborne or, for the respirator defendants, failed to prevent the inhalation of asbestos. They failed to use
10   the amount of care that a reasonably careful person would use in similar circumstances to avoid
11   exposing others to a foreseeable risk of harm. Third, Randolph Morton developed cancer. Fourth, each
12   defendant's negligence was a substantial factor in causing Randolph Morton's cancer. Plaintiff hereby
13   incorporates by reference, as though fully set forth herein, each and every allegation contained in the
14   First Cause of Action, Paragraph II, Design Defect: Brakes and Clutches.

16                                              **III.**

17   **Negligent Failure to Warn about Products:** All named defendants except NATIONAL STEEL
18   AND SHIPBUILDING COMPANY, and the 1st through 100th Doe defendants, are liable for their
19   negligent failure to warn about their products. First, these defendants designed, manufactured,
20
21   distributed, sold, and leased the products, including brake and clutch assemblies as set forth in the First
22   Cause of Action, Paragraph II, above. Second, these defendants knew or reasonably should have known
23   that each product was dangerous or was likely to be dangerous when used or misused in a reasonably
24   foreseeable manner, because each product caused hazardous asbestos to become airborne or, for the
25   respirator defendants, failed to prevent the inhalation of asbestos. Third, these defendants knew or
26   reasonably should have known that users would not realize the danger. Fourth, these defendants failed to
27
28   adequately warn of the danger or instruct on the safe use of each product. Fifth, a reasonably careful

                                                10

1  person under the same or similar circumstances would have warned of the danger or instructed on the

2  safe use of each product. Sixth, Randolph Morton developed cancer. Seventh, each defendant's negligent

3
   failure to warn or instruct was a substantial factor in causing Randolph Morton's cancer. Plaintiff
4
   incorporates by reference as though fully set forth therein allegations contained in the First Cause of
5
6  Action, Paragraph IV, Knowledge of Hazards.

7                                          **IV.**

8       **Negligent Failure to Recall and Retrofit Products:** All named defendants except NATIONAL

9  STEEL AND SHIPBUILDING COMPANY, and the 1st through 100th Doe defendants, are liable for

10 their negligent failure to recall and retrofit their products. First, these defendants designed,

11 manufactured, distributed, sold, installed and leased the products. Second, these defendants knew or

12 reasonably should have known that each product was dangerous or was likely to be dangerous when

13 used in a reasonably foreseeable manner, because each product caused hazardous asbestos to become

14 airborne or, for the respirator defendants, failed to prevent the inhalation of asbestos. Third, these

15 defendants became aware of this defect after each product was sold. Fourth, these defendants failed to

16 recall and retrofit each product. Fifth, a reasonably careful person under the same or similar

17 circumstances would have recalled and retrofitted each product. Sixth, Randolph Morton developed

18 cancer. Seventh, each defendant's negligent failure to recall and retrofit each product was a substantial

19 factor in causing Randolph Morton's cancer.

20                          **THIRD CAUSE OF ACTION FOR FRAUD**

21                                          **I.**

22      **Fraudulent Concealment:** The respirator defendants, and the 1st through 200th Doe defendants,

23 are liable for their fraudulent concealment. First, the defendants intentionally failed to disclose certain

24 facts, known only to them and that Randolph Morton could not have discovered, regarding the

25 inadequacy of the respirator for use as protection from asbestos. Second, Randolph Morton did not know

26 of the concealed facts. Third, the defendants intended to deceive Randolph Morton by concealing the

27 facts. Fourth, had the omitted information been disclosed, Randolph Morton reasonably would have

28 behaved differently. Fifth, Randolph Morton developed cancer. Sixth, each defendant's concealment was

11

1  a substantial factor in causing Randolph Morton's cancer.

2                                    III.

3       **Intentional Misrepresentation:** The respirator defendants, and the 1st through 200th Doe

4  defendants, are liable for intentional misrepresentation. First, the defendants represented to Randolph

5  Morton, both directly and through others, that the respirators would protect him from inhaling harmful

6  amounts of asbestos. Second, this representation was false, as the respirators failed to protect him from

7  harmful amounts of asbestos. Third, defendants knew that the representation was false when it made it,

8  or that defendants made the representation recklessly and without regard for its truth. Fourth, defendant

9  intended that Randolph Morton rely on the representation. Fifth, Randolph Morton reasonably relied on

10  the representation. Sixth, Randolph Morton developed cancer. Seventh, Randolph Morton's reliance on

11  defendants' representation was a substantial factor in causing his cancer.

12                                    IV.

13      **Negligent Misrepresentation:** The respirator defendants, and the 1st through 200th Doe

14  defendants, are liable for intentional misrepresentation. First, the defendants represented to Randolph

15  Morton, both directly and through others, that the respirators would protect him from inhaling harmful

16  amounts of asbestos. Second, this representation was false, as the respirators failed to protect him from

17  harmful amounts of asbestos. Third, although defendants may have honestly believe that the

18  representation was true, they had no reasonable grounds for believing the representation was true when

19  made. Fourth, defendant intended that Randolph Morton rely on the representation. Fifth, Randolph

20  Morton reasonably relied on the representation. Sixth, Randolph Morton developed cancer. Seventh,

21  Randolph Morton's reliance on defendants' representation was a substantial factor in causing his cancer.

22                    **FOURTH CAUSE OF ACTION FOR PREMISES LIABILITY**

23      All named Premises Defendants, and the 1st through 200th Doe defendants, are liable for

24  premises liability. First, the defendants owned, leased, occupied or controlled the property. Second,

25  defendants were negligent in the use or maintenance of the property. Third, Randolph Morton

26  developed lung cancer. Fourth, defendants' negligence was a substantial factor in causing Randolph

27  Morton's lung cancer.

28

                                      12

## FIFTH CAUSE OF ACTION FOR MARKET SHARE/ENTERPRISE LIABILITY

### I.

All named friction defendants and the bulk suppliers of asbestos and talc, and the 1st- 200th Doe defendants, are liable for their negligence according to their market share consistent with the rules set forth in *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 and *Wheeler v. Raybestos Manhattan* (1992) 8 Cal.App.4th 1152. Plaintiff hereby incorporates by reference, as though fully set forth herein, each and every allegation contained in the First through Fourth Cause of Action.

### II.

At all times mentioned herein, the Friction Defendants each manufactured, tested, developed, imported, converted, compounded, assembled, fabricated, modified, designed, specified, approved, sold, supplied, distributed, delivered, packaged, labeled, advertised, marketed, warranted, applied, installed, inspected and otherwise marketed asbestos-containing motor vehicle friction products. The asbestos and talc suppliers sold asbestos and talc contaminated with asbestos for use in consumer products.  These products were defective and carried with them an inadequate warning, or no warning at all, regarding asbestos-related health hazards. The defendants, and each of them, knew or should have known of the defective and hazardous nature of the asbestos-containing motor vehicle friction products at the time that said products were placed in the stream of commerce.

### III.

Plaintiff, at all times pertinent herein, was unaware and cannot be charged with knowledge of the health hazards associated with exposure to asbestos fibers released from the asbestos- containing motor vehicle friction products of the defendants, and each of them. On the other hand, the defendants, and each of them, introduced these asbestos-containing motor vehicle friction products into the market where plaintiff worked and defendants were in a position to prevent harmful exposures to all persons therein, including plaintiff.

### IV.

Plaintiff, at all times pertinent herein, was exposed to asbestos fibers released from asbestos-containing motor vehicle friction products that are and were fungible in color, size, shape, texture and function. Said products were indistinct and similar in appearance and composition, and through no fault

13

1  of the plaintiff these products cannot be traced to a particular defendant or other entity.  The bulk

2  asbestos and talc sold for use in consumer products was also fungible in color, size, shape, texture and

3  function. Said products were indistinct and similar in appearance and composition, and through no fault

4  of the plaintiff these products cannot be traced to a particular defendant or other entity.

<strong>V.</strong>

6  In this action, plaintiff has joined as defendants a substantial share of the manufacturers and

7  suppliers of the asbestos-containing motor vehicle friction products that comprised the relevant market

8  within which plaintiff was exposed to asbestos fibers.  For the bulk asbestos and talc suppliers, plaintiff

9  has joined as defendants a substantial share of the suppliers who sold asbestos and talc for use in

10 particular products used by plaintiff.  At trial, plaintiff will prove the respective market share of the

11 defendants, and each of them, during all relevant times herein. The liability of the defendants, and each

12 of them, is proportional to their respective market share percentage consistent with the rules set forth in

13 *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 and *Wheeler v. Raybestos Manhattan* (1992) 8

14 Cal.App.4th 1152.

<strong>VI.</strong>

16 Plaintiff is informed and believes, and on the basis of such information and belief alleges, that at

17 all times relevant herein, the number of producers of asbestos-containing motor vehicle friction products

18 of the type that plaintiff used or was otherwise exposed to, and the nature and structure of the market

19 and industry for asbestos-containing motor vehicle friction products, was such that there is and was a

20 substantial likelihood that plaintiff would have actually used or otherwise been exposed to the asbestos-

21 containing motor vehicle friction products of each of the defendants.

<strong>BASIS FOR PUNITIVE DAMAGES</strong>

<strong>I.</strong>

24 **Malice, Oppression, and Fraud:** All named defendants, and the 1st through 200th Doe

25 defendants, are liable for punitive damages because they engaged in the conduct that caused plaintiff's

26 harm with malice, oppression, and fraud. First, the defendants committed malice in that they acted with

27 intent to harm when they caused Randolph Morton's asbestos exposures, and because their conduct was

28 despicable and was done with a willful and knowing disregard of the rights and safety of others. Second,

14

1   the defendants committed oppression in that their conduct was despicable and subjected Randolph

2   Morton to cruel and unjust hardship in knowing disregard of his rights. Third, the defendants committed

3   fraud in that they intentionally concealed and misrepresented material facts and did so intending to harm

4   Randolph Morton. The defendants' conduct constituting malice, oppression, and fraud was committed

5   by, authorized by, and adopted by one or more officers, directors, and managing agents of each

6   defendant, who acted on behalf of each defendant.

7

8                              **PRAYER FOR DAMAGES**

9                                        **I.**

10   Plaintiff prays for judgment against all defendants for:

11      1.  Economic and non-economic compensatory damages in excess of $25,000;

12      2.  Punitive damages according to proof;

13      3.  Pre- and post-judgment interest;

14      4.  Costs of suit; and

15      5.  Such other relief as is fair, just, and equitable.

16

17                              **DEMAND FOR JURY TRIAL**

18                                        **I.**

19
     Plaintiff hereby demands a trial by jury on all issues so triable.
20

21

22

23   Dated: March 17, 2018                    Respectfully submitted,

24

25                               By:   _____
                                       H. W. Trey Jones
26                                     Attorney for Plaintiff

27

28


                                            15

                              Complaint for Personal Injury

# EXHIBIT B

 CT Corporation

**Service of Process Transmittal**
06/29/2018
CT Log Number 533613846

TO:  Mark Nackman
National Steel and Shipbuilding Company
2798 East Harbor Drive, MS 21-J
San Diego, CA 92113-3650

RECEIVED

JUL 0 2 2018

RE:  **Process Served in California**

NASSCO LEGAL DEPT

FOR:  National Steel and Shipbuilding Company  (Domestic State: NV)

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Randolph Morton and Edna S. Morton, Pltfs. vs. 3M Company, etc., et al., Dfts. // To: National Steel and Shipbuilding Company |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Complaint, Cover Sheet, Instructions, Addendum and Statement, Notice, Stipulation(s), Order |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Hill Street, CA Case # BC702643 |
| **NATURE OF ACTION:** | Asbestos Litigation - Personal Injury |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/29/2018 at 14:45 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Trey Jones Law Office of H.W. Trey Jones 680 South Santa Fe Ave. Los Angeles, CA 90021-1315 310-575-9955 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 06/30/2018, Expected Purge Date: 07/05/2018 |
| | Image SOP |
| | Email Notification,  Michele Barry  mbarry@Nassco.com |
| | Email Notification,  George Booker  gbooker@nassconorfolk.com |
| | Email Notification,  Mark Nackman  mark.nackman@nassco.com |
| | Email Notification,  Christine Mueller  christine.mueller@nassco.com |
| | Email Notification,  Sienna Cowell  scowell@nassconorfolk.com |
| **SIGNED:** **ADDRESS:** | C T Corporation System 818 West Seventh Street Los Angeles, CA 90017 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
06/29/2018
CT Log Number 533613846

TO: Mark Nackman
National Steel and Shipbuilding Company
2798 East Harbor Drive, MS 21-J
San Diego, CA 92113-3650

RE: **Process Served in California**

FOR: National Steel and Shipbuilding Company  (Domestic State: NV)

TELEPHONE:                213-337-4615

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND HOUR OF SERVICE: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| Summons, Instructions, Complaint, Cover Sheet, Instructions, Addendum and Statement, Notice, Stipulation(s), Order | By Process Server on 06/13/2018 at 20:56 | Mark Nackman National Steel and Shipbuilding Company | 533511146 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
3M Company a/k/a Minnesota Mining & Manufacturing
Company, (SEE ADDITIONAL PARTIES )

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* RANDOLPH MORTON
AND EDNA S. MORTON

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

APR 18 2018

Sherri R. Carter, Executive Officer/Clerk
By Nancy Alvarez, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | CASE NUMBER:
*(Número del Caso):* |
|---|---|
| The name and address of the court is:
*(El nombre y dirección de la corte es):*
Los Angeles Superior Court,-Central District
111 North Hill Street, Los Angeles, CA 90012 | **BC702643** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Trey Jones, Esq. , 680 S. Santa Fe Ave, Los Angeles, CA 90021, Phone: 310-575-9955

| DATE: | APR 18 2018 | Clerk, by | NANCY ALV | Deputy |
|---|---|---|---|---|
| *(Fecha)* | | **SHERRI R. CARTER** *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

(SEAL)

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*  **NATIONAL STEEL AND SHIPBUILDING COMPANY**

under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov